1

2

3

4

5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8    JOSE A. RODRIGUEZ-MONTERO,                No. C-09-3073 EMC (PR)

9              Plaintiff,

                                              **ORDER DENYING PETITION FOR**
10        v.                                  **WRIT OF HABEAS CORPUS AND**
                                              **DENYING CERTIFICATE OF**
11   BRUNO STOLC, Warden, *et al.*,           **APPEALABILITY**

12             Defendants.
     _____/
13

14              **I.    INTRODUCTION**

15        Jose A. Rodriguez-Montero, a prisoner of the State of California, filed this *pro se* action

16   seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   The matter is now before the court

17   for consideration on the merits.  For the reasons discussed below, the petition will be denied.

18              **II.   BACKGROUND**

19        Rodriguez-Montero was convicted of assault with a deadly weapon and by means of force

20   likely to produce great bodily injury.  He was sentenced to thirteen years, four months in state

21   prison.

22   *People v. Rodriguez-Montero*, 2008 WL 2516484 (Cal. App. 2008).

23        The state appellate court provided this summary of the evidence:

24             The prosecution began its case with testimony from [Raul]
           Ake, who testified that in September 2005, he lived in an apartment in
25         Santa Rosa with five other individuals. He had known defendant for
           approximately six years, and at one point defendant had lived in Ake's
26         apartment for a month or two after being released from jail. He left
           about eight months prior to the incident, however, because, according
27         to Ake, defendant "drinks too much" and "starts looking for fights and
           insulting." After he moved out of Ake's apartment, defendant moved
28         in with one of his brothers in an apartment in the same complex. At the

**United States District Court**
For the Northern District of California

time of the altercation, another one of defendant's brothers lived with Ake, as did a friend by the name of Guillermo, who goes by the nickname "Memo."

On the night of September 10, 2005, Ake returned home from work around midnight and found Memo drunk and asleep on the sofa in the living room. Ake went into his bedroom where he was "cool[ing] off" and watching television, when he heard someone outside yelling the name "Memo." Peering out the window, Ake saw defendant, who had previously threatened to hit him, running towards the apartment. Because he did not want defendant coming in and causing trouble, Ake got up and locked the front door. He then went into the kitchen to get some bread. As he did so, defendant began knocking "really hard" on the door. One of Ake's roommates, Jose Vasquez, who had either just returned home or had been in another bedroom, opened the front door and let defendant in.

After entering the apartment, defendant, who appeared to have been drinking, attempted without success to wake Memo. Ake did not want any trouble, but defendant began insulting him and his family and threatened to hit him. Ake told him three times to get out, but defendant persisted with his insults, prompting Ake to insult him back. After this exchange, defendant walked out the front door, which Ake then closed behind him. The door did not latch, however, and defendant came back in and began hitting Ake. As Ake described it, "He came in running, and he grabbed me. And he grabbed my head with one hand, and he was hitting me in the nose with his other hand ." Ake unsuccessfully tried to fend him off and they both eventually fell to the floor with defendant on top, still hitting Ake. Defendant then pinned him down by putting his knees on Ake's chest, so Ake turned his head and bit defendant's leg. Defendant still did not get off, so Ake grabbed his hand and bit his finger. At that point, Vasquez, who had left the apartment after defendant came in, returned and told defendant to get out.

Ake got up and went into the bathroom to wash his face because his nose was bleeding. As he was sitting on the closed toilet seat, he heard somebody yell, "He's coming after you with a knife."[1] Defendant then came into the bathroom holding a knife, described by Ake as a kitchen knife with a ten-inch blade and a three-inch handle, and threatened to kill him with the knife. Defendant kicked Ake in the chest, arm, and face and then hit him in the back of the head about ten times with the blunt end of the knife handle, cutting his shoulder with the tip of the knife blade. Defendant ignored Ake's please [sic] to stop, so Ake dropped to the floor and defendant finally stopped hitting him and left the bathroom, taking the knife with him. Ake was still laying [sic] on the bathroom floor when the police arrived.

Ake was transported to the hospital by ambulance, where he received stitches for a laceration behind his left ear. He also suffered a concussion and a cut on one of his fingers, and his right eye was

---

[1] The parties stipulated that in his testimony at the preliminary hearing, Ake did not testify that someone had yelled out to him that defendant was coming after him with a knife.

bruised and swollen shut. After he was released from the hospital, he stayed home for seven or eight days and could not work. He took prescription pain medication for three or four days to treat strong headaches, but by the time of trial, he had recovered from his injuries and suffered no lingering effects.

Santa Rosa Police Officer Brian Mann then took the stand. He was on patrol that night when he received a call at about 15 minutes after midnight concerning a possible stabbing. He arrived at Ake's apartment, where he found four individuals standing inside, one of whom was pointing towards the bathroom and saying, "He's in the bathroom." Mann then noticed spots of blood on the living room doorway and the carpet. He walked to the bathroom, where he found Ake sitting shirtless on the floor, holding his hand to the left side of his head behind his ear. Ake's chest and face were covered in dried blood, and his left hand was covered in wet blood, suggesting he had a head wound that was still bleeding. There were numerous spots of blood all over the bathroom. Mann briefly spoke with Ake while waiting for the medical personnel to arrive, but Ake appeared to be in a lot of pain and was unable to communicate other than telling the officer his name.

Officer Mann then spoke with the four individuals in the apartment, all of whom were reluctant to cooperate but ultimately provided him with information that led to the identification of defendant as the suspect. He prepared a photo lineup which he showed to Ake at the hospital, and in "about two seconds" Ake identified defendant as the individual who assaulted him. Mann then went to defendant's apartment, where he found him sleeping on a bed. After waking him, Mann noticed a large amount of blood on the front of his pants. He then placed defendant under arrest.

Officer Mann related the version of events as defendant described them to him that evening: "He told me he had gone to his brother's house to visit. When he got there, he noted his brother was gone. He told me Mr. Ake started yelling at him for no reason; basically in fact, told him to, 'Get the fuck out.' [Defendant] started arguing back with Mr. Ake, and they both started fighting." Defendant told the officer that while he did not remember who threw the first punch, he had to strike Ake numerous times to get Ake to stop biting him. He denied that a knife was involved. He also told the officer that he fled the apartment after he broke free from Ake and was chased by some of the individuals who had been in the apartment.

While they were still in defendant's apartment, defendant pointed out an injury to a finger on his left hand which, according to Officer Mann's testimony, appeared "very severe," and explained that Ake bit him. Defendant was taken to the hospital for treatment, where it was discovered that he also had a bite wound on his leg. It was subsequently determined that defendant's finger was fractured from Ake's bite. Defendant also complained of pain to the middle finger of his right hand, which was swollen. According to Mann, "It appeared he had been injured hitting something."

**United States District Court**
For the Northern District of California

1
2

       Officer Mann searched Ake's apartment for the knife, but was unable to locate it. Officers also searched areas outside the apartment but never located the knife.

3
4
5
6
7
8

       After the prosecution rested, defendant took the stand in his own defense. He testified that he had known Ake for about 15 years, having first met him in Mexico. They had lived together many times and, during the most recent occasion, had an argument because Ake had too many parties. This was a problem for defendant because he was on felony probation after having been convicted of assault with intent to commit rape. As a term of his probation, defendant could not drink and could not be at parties with people who drink. As a result, defendant moved out of the apartment. He admitted they had also argued about defendant's failure to pay rent while he was living at the apartment.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

       On the night of September 10, 2005, defendant went to Ake's apartment to get a key from one of his brothers to open his other brother's apartment. When he got to the apartment, he called out for "Yipis," who is also known as Memo or Guillermo Vasquez. Defendant claimed that he wanted him to get the key from his brother so he did not have to see Ake. Jose Vasquez let him into the apartment, and when he went in, he saw Ake in the kitchen. He proceeded to his brother's room and knocked on the door, but no one answered, so he went back to the living room, where he spotted Memo asleep on the couch. He was attempting to wake Memo when Ake gave him "a bad look" and told him not to wake Memo. Ake began insulting him and his mother, so he did the same thing back. He then left the apartment, but Ake continued to insult him so he went back inside. Jose Vasquez got in the middle, but the two continued their insults. Ake then "came running against" him, and they ended up "hugging." Ake "grabbed and hung" from his hair, and they both fell to the ground, wrestling. Defendant testified that he did not know who hit whom first, but at some point he ended up on top of Ake, grabbing his hands because Ake was trying to punch him. Defendant told Ake to "just ... calm down," but he did not, instead biting defendant on the leg. At this point there were five individuals watching them, and he said to them, "Please remove him from me," but nobody intervened. Defendant could not stand the pain from the leg bite so he hit Ake in the face. Ake then got loose and ended up on top of him, scratching and hitting him as he tried to protect himself from Ake's punches. Defendant was trying to push Ake off of him when his left index finger slipped into Ake's mouth and Ake bit it without letting go. Defendant began screaming for help from the other men, but, again, no one came to his aid. While Ake continued to bite his left finger, defendant was hitting him in the face.

24
25
26
27
28

       Ake finally let go of defendant's finger, got up, and walked away. Defendant did not know where Ake went as he was preoccupied with looking for an expensive chain and medallion he had been wearing around his neck. When he could not find them, he went looking for Ake, who he thought had his chain, and found him sitting in the bathroom on the closed toilet. Ake had something in his hand and defendant thought he was going to hit him with it, so he kicked Ake in the chest before he could raise his hand to strike, causing him

4

to drop the object. When asked why he kicked Ake in the chest, defendant answered, "I was upset." Ake attempted to retrieve the object, but defendant began punching him in the head with his middle knuckle extended. When asked why he did so, he testified, "Because he bit off my finger." After defendant hit him, Ake fell to the floor, and defendant left the bathroom. The other men were still in the living room, and they began insulting him. Defendant demanded his chain, which he then found on the kitchen table. He had lost his shoes during the altercation and grabbed someone else's shoes as he ran out of the apartment with the other men chasing him to the door and one of the men using a cell phone to make a call, presumably to the police.

Defendant denied telling Ake he was going to kill or stab him, that he had a knife at any point during the altercation, and that he had consumed any alcohol that evening.

On December 9, 2005, the jury returned a guilty verdict on count I, finding that defendant committed assault with a deadly weapon (a knife) and, alternatively, that he committed assault by means of force likely to produce great bodily injury. The jury also found it true that he inflicted great bodily injury upon Ake within the meaning of section 12022.7, subdivision (a). The jury found defendant not guilty on count II.

On December 20, 2006, the court sentenced defendant to 13 years, four months in state prison, comprised of the four-year upper term for assault, three years for the great bodily injury enhancement, five years for the prior serious felony conviction, and 16 months for probation violation in his section 220 case.[2]

*Id.* at *1-4 (footnotes in original but renumbered).

Rodriguez-Montero appealed.  The California Court of Appeal affirmed and the California Supreme Court denied review.

Petitioner filed his petition in this case in 2009.  The Court ordered respondents to show cause why the petition should not be granted.  They have filed an answer and memorandum of points and authorities in support of it, and have lodged the record with the court.  Petitioner has elected to stand on his petition rather than file a traverse.  The case is ready for decision.

---

[2]  Before the commencement of trial, defendant admitted the prior strike and serious felony conviction allegations. Prior to sentencing, defendant filed a motion to strike his prior strike conviction pursuant to section 1385, subdivision (a) and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. The court granted the motion for sentencing purposes.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### III.   STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

When, as is the case with some claims here, "a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011).  And it is not necessary that the state court's decision on the merits be accompanied by reasoning for § 2254(d) to be applied.  *Id.* at 784.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Id.*

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court

1   making the "unreasonable application" inquiry should ask whether the state court's application of

2   clearly established federal law was "objectively unreasonable." *Id.* at 409.

3        In the discussion below the court has first considers whether Petitioner's rights were

4   violated, then applies the AEDPA standard. *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)

5   (AEDPA does not require federal habeas court to adopt any particular methodology in deciding

6   whether state court decision is contrary to or unreasonable application of clearly established federal

7   law); *Weighall v. Middle*, 215 F.3d 1058, 1063 (9th Cir. 2000) (may be easier in some cases to

8   review state court's application of federal law for error and, if there was none, conclude that

9   state-court decision was not unreasonable).

10                              **IV.   DISCUSSION**

11  A.    Petitioner's Claims

12       As grounds for relief here, Petitioner contends that:  (1) He received ineffective assistance of

13  counsel when counsel failed to move to "sanitize" his prior rape conviction and disclosed to the jury

14  that Petitioner had been incarcerated and was on probation; (2) an erroneous jury instruction on

15  flight violated his right to due process; (3) the CALJIC 5.55 jury instruction conflicts with CALJIC

16  5.54 and that conflict denied his right to present a defense; (4) the trial court's failure to modify

17  CALJIC 5.54 and CALJIC 5.56 denied  his rights to due process and to present a defense; (5) the use

18  of CALJIC 5.40 deprived  of his rights to due process and to present a defense; (6) the use of

19  CALJIC 2.27 denied  his rights to due process and to present a defense; and (7) there was

20  cumulative error.

21       Respondents concede in their answer that these claims are exhausted.  Answer at 2.

22       1.    Ineffective Assistance of Counsel

23       Petitioner contends that his counsel was ineffective when he failed to move to "sanitize" the

24  record of Petitioner's prior rape conviction and disclosed to the jury that Petitioner had been

25  incarcerated and was on probation.

26       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

27  Amendment right to counsel, which guarantees not only assistance, but effective assistance of

28  counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In *Strickland* the United States

United States District Court
For the Northern District of California

7

Supreme Court set out a two-pronged test for evaluating claims of ineffective assistance of counsel.

First, the petitioner must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687–88, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 131 S. Ct. 770, 788 (citing *Strickland*, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 787 (quoting *Strickland*, 466 U.S. at 689). When considering an ineffective assistance claim in a habeas case, federal courts must apply a "doubly" deferential standard. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011); *Harrington*, 131 S. Ct. 788 (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

Second, the petitioner must establish prejudice from the deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Similarly, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *Strickland*, 466 U.S. at 697.

This claim was presented on direct review. The court of appeal set out the background, which is undisputed:

> During opening statements, defense counsel explained to the jury: "[Defendant] previously resided in the same apartment where [the fight] occurred with Mr. Ake and some other individuals. But [defendant], who is going to testify in this case, was in jail for a few months. And you're going to find out he was convicted of assault with

United States District Court

For the Northern District of California

intent to commit rape. He was convicted of that, and he spent some time-a few months in the Sonoma County jail. So you're going to hear about that, but only insofar as it relates to his credibility, okay? [¶] And he got out of custody, and was on probation because of that, and went to look for his brother at the apartment where Mr. Ake resided...."

Later, when defendant took the stand to testify, defense counsel elicited the following testimony from defendant:

"Counsel: When you lived [in Mr. Ake's apartment], did you have problems getting along with Mr. Ake?

"Defendant: No.

"Counsel: You've never had any disagreements with him?

"Defendant: Yes, we did have one.

"Counsel: What was that about?

"Defendant: I once-uh, there was an argument that [he] had too many parties.

"[¶] ... [¶] Counsel: Why was it a problem that Mr. Ake had parties?

"Defendant: Because I'm a-I'm on felony-I'm on felony probation.

"Counsel: So were you staying at the apartment while on felony probation?

"Defendant: Yes.

"Counsel: Now it is-Isn't it true you were convicted of assault with intent to commit rape?

"Defendant: Yes.

"Counsel: And that's-that's why you were on felony probation?

"Defendant: Yes, yes.

"Counsel: So because you were on felony probation, were there some restrictions on your activities?

"Defendant: Yes.

"Counsel: And how did-how did Mr. Ake's activities affect that?

"Defendant: Badly.

United States District Court

For the Northern District of California

"Counsel: Okay, but what-why-Why did you object to Mr. Ake having parties because you were on felony probation?

"[¶ ... [¶]Defendant: Because my probation officer has told me that I cannot drink and I cannot be at parties with people who drink."

[¶ ]

Turning first to defendant's prior conviction for assault with intent to commit rape, defendant argues that it was unreasonable for his counsel to allow the jury to learn of his defendant's prior conviction, an argument premised on his belief that the trial court was inclined to exclude evidence of the conviction for impeachment purposes because the evidence would be unduly prejudicial pursuant to Evidence Code section 352. Defendant grossly overstates the trial court's position.

Prior to the commencement of trial, the prosecution moved to introduce evidence in its case-in-chief of the defendant's prior criminal conduct that resulted in his section 220 conviction. In denying the motion, the court stated: "[F]or me to admit the prior act as evidence, it must be relevant to prove some fact such as motive, opportunity, intent, preparation, common place or scheme, knowledge, identity, absence, or mistake or accident, other than just simply his or her-in his disposition to commit such an act. Even if I found that there were enough similarities and there was relevancy in introducing this prior, the Court would then have to exercise its judgment under 352 of the Evidence Code. [¶] And quite frankly, in looking at the facts, I find really nothing that would lead this Court to believe that this prior, at this point, should be introduced.... [¶] So it's the Court's ruling, at this point, in the People's case in chief, I would not allow the introduction under 1101 of the Evidence Code. And if for some reason the Prosecution felt it became relevant in some other proceedings in this trial, I'd certainly reconsider it. But at this point, I feel it should not be brought before the jury."

*Id.* at *5-6.

Petitioner argues that counsel's mentioning the prior conviction was ineffective assistance because the court had indicated it would exclude that evidence. The court of appeal held that:

Contrary to defendant's claim, the court never expressed an opinion that the conviction was too prejudicial for it to be admitted. When the court was discussing the relevance and prejudicial effect of defendant's prior, it was doing so in the context of the prosecution's motion in limine to introduce his *prior criminal conduct* under Evidence Code section 1101, subdivision (b). The court was thus focused on whether defendant's prior *conduct* was admissible to show, as stated in the prosecution's motion, "a common plan, scheme or design, or modus operandi."[3]  This is a completely different question

[3]  Evidence Code section 1101, subdivision (b) allows for "the admission of evidence that a person committed a crime ... when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ... ) other than his or her disposition to commit such an act."

United States District Court

For the Northern District of California

1
2
3

> than whether the fact of defendant's prior *conviction* was admissible to impeach his credibility if he took the stand in his own defense. There is absolutely nothing in the record suggesting the trial court believed the fact of the *conviction* was inadmissible for the latter purpose.

4   *Id.* at *7 (italics in original) (footnote in original but renumbered).  Petitioner has not disputed this

5   conclusion, and in any event this Court agrees that the trial court's comments did not address use of

6   the conviction for impeachment.  The question, then, is whether counsel was ineffective in not

7   seeking to exclude use of the conviction for impeachment and in mentioning it preemptively.

8          The court of appeal held that the conviction was in fact admissible for impeachment as a

9   matter of California law under the California Constitution and the California Evidence Code, *id.* at

10   *8, and that the trial court would not have excluded it under section 352 of the California Evidence

11   Code, *id.*, which provides for discretionary exclusion of evidence if "its probative value is

12   substantially outweighed by the probability that its admission will (a) necessitate undue

13   consumption of time or (b) create substantial danger of undue prejudice, or confusing the issues, or

14   of misleading the jury."  Cal. Evid. Code § 352.

15          The holding as to admissibility under the California Constitution and the California Evidence

16   Code is binding on this Court.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (a state court's

17   interpretation of state law, including one announced on direct appeal of the challenged conviction,

18   binds a federal court sitting in habeas corpus).  The holding is amply justified.  As the court of

19   appeal noted, the prior conviction occurred only five months before trial, so was not stale, and the

20   only prejudice  suffered was that contemplated by the rule allowing such impeachment, that the

21   witness's credibility would be undermined by evidence of his or her having committed a crime of

22   moral turpitude.  *Rodriguez-Montero*, 2008 WL 2516484 at *8.  The Court therefore agrees that if

23   counsel had moved to exclude use of the conviction for impeachment, that motion would have been

24   denied.

25          Trial counsel cannot have been ineffective for failing to make a meritless motion.  *Juan H. v.*

26   *Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *see*, *e.g.*, *Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th

27   Cir. 2008) (finding counsel's failure to object to admission of defendant's prior sexual misconduct

28   as propensity evidence not ineffective where evidence would have been admitted in any event to

United States District Court

For the Northern District of California

1   show common plan or intent); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 2994) (failure to file

2   suppression motion not ineffective assistance where counsel investigated filing motion and no

3   reasonable possibility evidence would have been suppressed).  *See also Wilson v. Henry*, 185 F.3d

4   986, 990 (9th Cir. 1999) (to show prejudice under *Strickland* from failure to file a motion,  must

5   show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted

6   it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an

7   outcome more favorable to him).  Because a motion to exclude the conviction would have failed,

8   counsel was not ineffective in failing to make it and Petitioner was not prejudiced by the failure.

9        Petitioner also contends that counsel was ineffective in failing to ask the trial court to

10  "sanitize" the conviction by barring reference to its sexual nature, and in bringing it up himself,

11  rather than waiting for it to be used for impeachment.  The court of appeal held that sanitizing the

12  prior conviction for assault with intent to commit rape would have resulted in it being described as

13  "felony assault," that is, the same crime as that with which Petitioner was charged in this case.

14  *Rodriguez-Montero*, 2008 WL 2516484 at *9.  The court of appeal held that sanitizing the

15  conviction would have been more harmful to Petitioner's interests than not doing so, because of the

16  risk that the jury would consider it – "albeit improperly" – as propensity evidence.  *Id.*  And of

17  course it is reasonable trial tactics for counsel to bring up potentially damaging information so as to

18  "draw the sting" as much as possible.  Counsel's conduct at trial was reasonable under the

19  circumstances.  For these reasons, Petitioner has failed to overcome the "'strong presumption' that

20  counsel's representation was within the 'wide range' of reasonable professional assistance."

21  *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689).

22        2.    Jury Instruction Claims

23        Petitioner contends that (1) an erroneous jury instruction on flight violated due process;

24  (2) the CALJIC 5.55 jury instruction conflicts with CALJIC 5.54 and that conflict denied him his

25  right to present a defense; (3) the trial court's failure to modify CALJIC 5.54 and CALJIC 5.56

26  denied  his rights to due process and to present a defense; (4) the use of CALJIC 5.40 deprived

27  Petitioner of his rights to due process and to present a defense; and (5) the use of CALJIC 2.27

28  denied Petitioner his rights to due process and to present a defense.

a.   <u>Standard</u>

"Even if there is some 'ambiguity, inconsistency or deficiency' in [a jury] instruction, such an error does not necessarily constitute a due process violation." *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)).  For instructional error to amount to a due process violation, the Petitioner must show both that the instruction was defective and that there was a "reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Id.* at 190-91 (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotation marks and citation omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

In addition, it is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case. *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000).  Failure to instruct on the theory of defense violates due process if "'the theory is legally sound and evidence in the case makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006) (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)).  However, a defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred, however. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.* (citation omitted); *see, e.g., Coleman*, 210 F.3d at 1051 (finding *Brecht* error where "at the very least" the court could not "'say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'") (citation omitted).

**United States District Court**
For the Northern District of California

1

            b.      <u>Flight Instruction</u>

2

      Petitioner contends that there was not sufficient evidence of flight to support giving a flight

3

instruction.  This claim was presented on direct appeal.  As to it, the court of appeal said:

4

5

6

7

8

        Defendant contends that the trial court erred in instructing the jury, over defense counsel's objection, with CALJIC No. 2.52, which provides as follows: "The flight of a person immediately after the commission of a crime is not sufficient, in itself, to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."[4]  Defendant asserts there was insufficient evidence of flight to justify the giving of the instruction.

9

10

11

12

13

14

15

        "A flight instruction is proper whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs, or of his escape from custody after arrest, logically permits an inference that his movement was motivated by guilty knowledge." (*People v. Turner* (1990) 50 Cal. 3d 668, 694.) "It is clear that the instruction may not be given in the absence of some evidence which might reasonably be interpreted as indicating flight by defendant from the scene of the crime." (*People v. Lutz* (1980) 109 Cal. App. 3d 489, 498.) We must thus determine whether the prosecution presented sufficient evidence from which the jury could have reasonably inferred that defendant fled from the altercation with Ake. (*Ibid.*)

16

17

18

19

20

21

22

23

        Defendant testified that after Ake dropped to the floor in the bathroom, he retrieved his chain from a table in the kitchen and then searched for his shoes. Unable to find them, he grabbed a different pair. He then ran out of the apartment, with Ake's roommates chasing him to the door. As defendant ran out of the door, he saw one of the men making a telephone call on a cell phone, which he presumed was to the police since someone said they were going to call the police. Defendant continued across the apartment complex and into the apartment he shared with his brother. From this, a jury could reasonably have inferred that defendant fled the apartment because he was guilty of assaulting Ake. (*See, e.g., People v. Lutz, supra,* 109 Cal. App. 3d at p. 499 [flight instruction was proper where defendant left his apartment 10 minutes after a crime was committed and did not return for many hours]; *People v. Cannady* (1972) 8 Cal.3d 379, 391 [evidence that defendants were walking away from the scene of the crime was sufficient to support giving the instruction].)

24

25

26

27

28

     [4] This instruction is derived from section 1127c, which provides in pertinent part: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

United States District Court
For the Northern District of California

Additionally, the jury convicted defendant of assaulting Ake with a knife, yet no knife was found on defendant or in his apartment, supporting a reasonable inference that he fled from the apartment to dispose of the knife. The instruction was, therefore, properly given.

Defendant disputes this conclusion, placing great emphasis on the fact that because he left the apartment *before* the police were called, he could not have been fleeing from the police. Instead, he submits, the evidence showed that he left the apartment because Ake's roommates were chasing him, which does not reflect consciousness of guilt. And he simply went to his apartment, which was 100 to 150 yards away in the same complex. Defendant's argument is misplaced, however, because the question is not whether defendant was fleeing from the police but whether he was fleeing from the scene of a crime, and the fact that he ran from the apartment after the altercation with Ake could reasonably have been construed by the jury as flight from the scene of a crime. Additionally, flight does not require "the reaching of a far away haven." (*People v. Cannady, supra,* 8 Cal. 3d at p. 391.)

That being said, we do not disagree that based on defendant's testimony, a reasonable inference could be drawn that defendant fled because he was being chased. However, it remains that a reasonable inference could also be drawn that he fled from the apartment because he was guilty of committing a crime. That conflict was a question of fact for the jury to resolve. (*People v. Caldera* (1959) 173 Cal. App.2d 98, 101.)

*Rodriguez-Montero*, 2008 WL 2516484 at *10-11.

As the court of appeal pointed out, Petitioner ran from the apartment where he had stabbed Ake, in such a rush that he did not even get his own shoes and after seeing one of the other occupants of the apartment apparently calling the police.  The court of appeal was correct that this was sufficient evidence to support giving the instruction, even if other interpretations might be placed on Petitioner's flight.  Petitioner thus has failed to establish that there was insufficient evidence to support the instruction.

Petitioner also argues under this heading that the instruction created an unconstitutional permissive inference.  An instruction that creates a permissive inference violates due process unless it can be said "'with substantial assurance'" that the inferred fact is "'more likely than not to flow from the proved fact on which it is made to depend.'"  *County Court of Ulster County v. Allen*, 442 U.S. 140, 167 & n. 28 (1979) (quoting *Leary v. United States*, 395 U.S. 6, 36 (1969)).  "[A] permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government proves certain predicate facts."  *United States v. Warren*, 25 F.3d 890, 897 (9th Cir.

1994) (analyzing whether jury instruction shifted burden of proof by determining whether inference permissive or mandatory).

The flight instruction, as given, read: "The flight of a person immediately after the commission of a crime is not sufficient, in itself, to establish his guilt, but is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." Resp't Ex. A, Vol 4 at 643. This instruction does not create a permissive inference at all; it simply says that flight can be evidence of guilt, and explicitly says it is *not* sufficient in itself to establish guilt. That is, the instruction warns the jury *not* to make a permissive inference of guilt. The instruction did not contain an unconstitutional permissive inference.

Finally, Petitioner argues that "because the instruction allowed the jury to infer a consciousness of guilt on the part of [Petitioner], but not Ake, it created an imbalance that rendered the trial fundamentally unfair in violation of [due process]." Pet., attached Petition for Review at 8. Petitioner cites no authority that an "imbalance" in instructions such as one alleged here is unconstitutional.

The rejections of these claims by the state appellate courts were not contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

c.      CALJIC No. 5.55 and CALJIC No. 5.54

Petitioner contends that two jury instructions, CALJIC 5.55 and CALJIC 5.54, conflict, and that giving them denied him his right to present a defense. *Id.* at 9-12. The California Court of Appeals explained:

> In his next challenge to the jury instructions, defendant submits that the trial court erred in the manner in which it instructed the jury on self-defense. As to the use of self-defense by an aggressor (CALJIC No. 5.54), the court instructed: "The right of self-defense is only available to a person who initiated an assault, if, [¶] (one), he has done all the following: [¶] (a), he has actually tried, in good faith, to refuse to continue fighting; [¶] (b), he has, by words or conduct, caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and, [¶] (c), he has, by words or conduct, caused his opponent to be aware, as a reasonable person, that he has stopped fighting. [¶] After he has done all these three things, he has the right to self-defense if his opponent continues to fight." The court then instructed the jury with CALJIC No. 5.55: "The right of self-defense is not available to a

United States District Court

For the Northern District of California

person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." According to defendant, "CALJIC No. 5.55 conflicts with CALJIC No. 5.54 and misstates the law by instructing the jury that an aggressor is foreclosed from raising a self-defense claim...." This conflict exists because, as defendant reads it, "every person who initiates a fight and subsequently claims self-defense fits within" the descriptions of CALJIC No. 5.55.

Defendant's analysis in support of his position is very lengthy with a detailed analysis of numerous California Supreme Court cases from the 1800's and other cases. But we can answer this question briefly by simply pointing out that defendant misconstrues the language of CALJIC No. 5.55. It does not apply to "every person who initiates a fight and subsequently claims self-defense." Rather, the plain language of the instruction makes clear that it applies only to a small subset of individuals who initiate a fight in order to contrive the necessity for self-defense and justify his or her violent actions. In other words, it applies only to an initial aggressor who commences combat for the purpose of provoking a violent reaction so that he or she can then retaliate with further violence under the guise of self-defense. CALJIC No. 5.55 instructs the jury that under such circumstances, self-defense is not available. There is no conflict with CALJIC No. 5.54.

We note that in a footnote defendant claims "CALJIC No. 5.55 contains no requirement that one operate with the *specific intent* to contrive a self-defense scenario." While the meaning of this argument is unclear, defendant appears to suggest that the "intent" language of CALJIC 5.55 does not actually mean what it says, and that it does not in fact apply only where the self-defense claim has been contrived. But that is exactly how the instruction operates. And courts have long recognized that CALJIC Nos. 5.54 and 5.55 are correct statements of the law. (*See, e.g., People v. Garvin* (2003) 110 Cal. App. 4th 484, 489 [standard CALJIC instructions on self-defense, including Nos. 5.54 and 5.55, are legally correct].)

*Rodriguez-Montero*, 2008 WL 2516484 at *11 (italics in original).

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'"   *Clark*, 450 F.3d at 904 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case.  *See Conde*, 198 F.3d at 739 (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence).  Due process does not require that an instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions

United States District Court
For the Northern District of California

1   adequately embody the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir.

2   1996); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979).

3      Petitioner argues that "the jury could have believed that [Petitioner] began a verbal quarrel

4   with Ake by insulting him and/or initiating physical contact with a simple assault, but was then met

5   with a sudden and excessive counter-assault when Ake bit his thigh and finger . . . or when

6   [Petitioner] entered the bathroom and saw Ake brandishing an object which he threatened

7   [Petitioner] with.  [Citation omitted]  As such, the jury could have found that [Petitioner's] reaction

8   was justifiable.  However, by instructing them with CALJIC No. 5.55, the trial court removed the

9   theory from their consideration, thereby preventing [Petitioner] from presenting his theory of

10   defense . . . ."  Pet., attached Petition for Review at 11.

11      "A defendant is entitled to an instruction on his [defense] theory of the case [only] if the

12   theory is legally cognizable and there is evidence upon which the jury could rationally find for the

13   defendant."  *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotations

14   omitted).  But the court of appeal's holdings that the two instructions were correct statements of

15   California law and do not conflict are binding here.  *See Bradshaw*, 546 U.S. at 76.  The state

16   appellate court's reading of CALJIC No. 5.55 is plainly correct.

17      Furthermore, there was no evidence that Petitioner initiated the quarrel with the intention of

18   provoking an attack to which he could respond under the guise of self-defense, so giving the

19   instruction could not have had a "substantial and injurious effect or influence in determining the

20   jury's verdict."  *See Brecht*, 507 U.S. at 637 (prejudice standard for federal habeas cases).

21      This claim is without merit.

22        d. <u>CALJIC 5.54 and CALJIC 5.56</u>

23      Petitioner contends that the trial court should have modified CALJIC 5.54 and CALJIC 5.56

24   to conform with modifications required by *People v. Quach*, 116 Cal. App. 4th 294 (2004), and that

25   failure to make the changes violated his right to a defense.

26      This claim was raised on direct appeal.  The court of appeal addressed it:

27        Defendant next contends the court gave incomplete instructions
     on self-defense by an aggressor (CALJIC No. 5.54) and self-defense

28        by a mutual combatant (CALJIC No. 5.56). As noted above, the court

read CALJIC No. 5.54 as follows: "The right of self-defense is only available to a person who initiated an assault, if, [¶] (one), he has done all the following: [¶] (a), he has actually tried, in good faith, to refuse to continue fighting; [¶] (b), he has, by words or conduct, caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and, [¶] (c), he has, by words or conduct, caused his opponent to be aware, as a reasonable person, that he has stopped fighting. [¶] After he has done all these three things, he has the right to self-defense if his opponent continues to fight."

Similarly, the court instructed the jury on the use of self-defense by a mutual combatant (CALJIC No. 5.56) as follows: "The right of self-defense is only available to a person who engages in mutual combat: [¶] (one), if he has done all the following: [¶] (a), he has actually tried, in good faith, to refuse to continue fighting; [¶] (b), he has, by words or conduct, caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and, [¶] (c), he has caused, by words or conduct, his opponent to be aware, as a reasonable person, that he has stopped fighting; and, [¶] (d), he has given his opponent the opportunity to stop fighting. [¶] After he has done all these four things, he has the right to self-defense, if his opponent continues to fight."

The court in *People v. Quach* (2004) 116 Cal. App. 4th 294 (*Quach* ) determined that CALJIC No. 5.56 did not accurately state the law of self-defense in that it failed to explain that if a "'counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense.'" (*Id.* at ¶. 301-302 [quoting *People v. Hecker* (1895) 109 Cal. 451, 463–464].)  In light of *Quach*, CALJIC Nos. 5.54 and 5.56 were amended in 2004 to add the following provisions, respectively: "If the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense." (CALJIC No. 5.54 (2004 re-rev.) (Fall ed.2007).) "If the other party to mutual combat responds in a sudden and deadly counterassault, that is, force that is excessive under the circumstance, the party victimized by the sudden excessive force need not attempt to withdraw and may use reasonably necessary force in self-defense." (CALJIC No. 5.56 (2004 re-rev.) (Fall ed.2007).) According to defendant, the evidence in this case demonstrated that Ake responded with a sudden and deadly counterassault such that the exceptions to the withdrawal and notice requirements added to CALJIC Nos. 5.54 and 5.56 in 2004 were implicated and the jury should have been instructed accordingly.

Defendant is correct on the law, but the record does not support his claim that the *Quach* modifications to CALJIC Nos. 5.54 and 5.56 should have been given in this case. There was simply no evidence from which a jury could have reasonably concluded that Ake responded to defendant's assault with "a sudden and deadly counterassault." By defendant's own testimony, when the initial altercation ended, Ake went into the bathroom while defendant looked

United States District Court

For the Northern District of California

around for his lost chain and medallion. When he was unable to locate them, he walked over to the bathroom and opened the door, where he found Ake sitting on the closed toilet seat with an unidentified object in his hand. Before Ake made any move towards defendant, defendant kicked him three times and then beat him about the head with either his fist (defendant's version) or a knife handle (Ake's version). Defendant himself testified that he continued his assault on Ake because he "was upset" and because Ake bit his finger. Nothing in the record suggests that Ake launched "a sudden and deadly counterassault" that precipitated defendant's beating of him. Defendant's fanciful claim that "[a] reasonable juror could also have found that this evidence indicating that Ake was wielding a foreign object, showed that Ake responded to [defendant] with sudden and deadly force" does not even merit a response.

Defendant also argues that the fact Ake bit him hard enough to fracture his finger was evidence that Ake responded to defendant's hits with "a sudden and deadly counterassault." Even if true, it would be irrelevant because the record demonstrates it was during the second half of the altercation, occurring in the bathroom, that Ake suffered his serious injuries and engaged in absolutely no aggressive behavior towards defendant whatsoever.

*Rodriguez-Montero*, 2008 WL 2516484 at *12-13.

Petitioner was convicted of assault with a deadly weapon, a knife. *Id.* at *4. Because there was no evidence that Petitioner used a knife at any point in the fight except in the confrontation in the bathroom (the second half of the altercation), it is only that part of the fight which is relevant to the self-defense theory. And as the court of appeal pointed out, there simply is no evidence that Ake launched a sudden and deadly counterassault in that part of the fight, whatever might have been the case in the earlier part of the altercation. That is, there was no evidence to support giving the *Quach* modifications. Thus, there was no due process violation and the rejections of these claims by the state appellate courts were not contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

    e. <u>CALJIC 5.40</u>

Petitioner contends that instructing the jury with CALJIC 5.40 violated his due process rights by lessening the prosecution's burden of proof and violated his right to a defense.

This claim was raised on direct appeal. The court of appeal said with regard to it:

The trial court also instructed the jury with CALJIC No. 5.40, concerning ejection of a trespasser: "The lawful occupant of a residence has the right to request a trespasser to leave the premises. If

20

the trespasser does not do so within a reasonable time, the occupant may use reasonable force to eject the trespasser. The amount of force which may be used to eject the trespasser is limited by what would appear, to a reasonable person, to be necessary to prevent physical injury or death to the occupant." Defendant argues the trial court committed error by giving this instruction because it "improperly permitted the jury to presume [defendant] was a trespasser thereby vitiating his claim of self-defense and lessening the prosecution's burden of proof...." According to defendant, this instruction "*presumed* that a trespass had occurred on the property in question. Since Ake was a current occupant of the apartment where the altercation took place, the only logical assumption for the jury to make was that [defendant] was that trespasser and that Ake was therefore justified in his use of force." (Fn.omitted.) We reject this argument for several reasons.

First, the instruction did not mandate a conclusion by the jury that defendant was trespassing. It simply and correctly-informed the jury that *if* an individual is trespassing and has been asked by the occupant to leave the premises but does not do so, the occupant can use reasonable force to eject the trespasser. Nothing more.

Second, although Jose Vasquez opened the door and allowed defendant to enter the apartment, Ake testified that before the first altercation, he asked defendant three times to leave the apartment. Thus, while initially defendant might have been an invited guest, the record could support a finding that defendant's permission to be on the property had been revoked such that he was then trespassing.[5] (*See, e.g., Martin Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal. App. 4th 1113, 1132 [trespass includes failure to leave].)

Third, the trial court instructed the jury with CALJIC No. 17.31, which provides, "The purpose of the Court's instructions is to provide you with the applicable law so you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given, I am expressing an opinion as to the facts." We generally presume that jurors understand and follow the court's instructions. *(See People v. Mickey* (1991) 54 Cal. 3d 612, 689, fn. 17.) The jury here may have found that the facts did not justify the application of this instruction.

Finally, defendant complains that instructing the jury on CALJIC No. 5.40 violated his right to impartiality between the prosecution and defense instructions, which constitutes reversible error. This, he says, was so because "the jury was not given impartial instructions on self-defense, but instead was instructed in a manner that was critical of [his] self-defense claim and skewed in favor of the prosecution's theory of the case." We fail to see how the instructions

---

[5] Defendant incorrectly states that "[t]he only evidence offered to suggest that this permission had been revoked, was Ake's testimony stating that Vasquez told [defendant] to 'go' after the initial fight ended in the kitchen."

1  | were slanted in the prosecution's favor, especially considering that the
2  | instructions on self-defense by an initial aggressor or a mutual combatant were clearly to defendant's benefit.

3  *Id.* at *13-14 (italics in original) (footnote in original but renumbered.)

4          The court of appeal's holding that the instruction was a correct statement of California law is

5  binding; as a result, any defense that Petitioner wished to present that was contrary to the instruction

6  was not "legally cognizable," and thus not a valid defense. *See United States v. Boulware*, 558 F.3d

7  971, 974 (9th Cir. 2009) (defendant is entitled to instruction in his theory of defense only if it is

8  legally cognizable and there is evidence to support it).  The same is true as to due process. *Clark*,

9  450 F.3d at 904-05 (failure to instruct on the theory of defense violates due process if "'the theory is

10 legally sound and evidence in the case makes it applicable.'" (quoting *Beardslee v. Woodford*, 358

11 F.3d 560, 577 (9th Cir. 2004)).  The instruction concerning ejection of a trespasser, particularly

12 when construed with CALJIC No. 17.31, did not vitiate Petitioner's claim of self-defense or lessen

13 the burden of proof.  This claim is without merit.

14          f.   CALJIC 2.27

15          Petitioner contends that the trial court violated his rights to due process and to present a

16 defense by instructing with CALJIC 2.27.  The court of appeal said with respect to this claim:

17  **CALJIC 2.27-Sufficiency of Testimony of One Witness**

18          Lastly, defendant objects that the trial court instructed the jury as follows: "You should give the

19  uncorroborated testimony of a single witness whatever weight you think it deserves. Testimony concerning any

20  fact by one witness, which you believe, whose testimony about that fact does not require

21  corroboration, is sufficient for the proof of that fact. You should carefully review all the evidence upon

22  which the proof of that fact depends." (CALJIC No. 2.27.) According to defendant, it was error for the court

23  to so instruct the jury because, as provided by the Use Note, CALJIC No. 2.27 is appropriate when

24  "corroboration of a witness's testimony is required ...," which was not the case here. As a result, he submits,

25  the court essentially advised the jury that they could find defendant's testimony "insufficient if

26  'uncorroborated,' " which diminished his testimony on which his entire defense relied.

27

28          First, we do not agree that the instruction advised the jury they could find defendant's testimony

1
2
3
4
5
6
7
8
9
10

insufficient if it was uncorroborated. But more
importantly, we need not determine whether the
instruction was properly given because even assuming
it was not, defendant did not suffer prejudice.
(*Chapman v. California* (1967) 386 U.S. 18, 24.)
Accepting arguendo defendant's version of the incident
as true, the record still does not support his claim of
self-defense since he admittedly went into the bathroom
and, without any provocation, violently beat Ake a
second time. Even if one could make an argument that
defendant's conduct during the initial altercation in the
living room constituted self-defense-and we express no
opinion on that issue-no such conclusion can be drawn
as to the second altercation in the bathroom. Under no
stretch of the imagination did defendant's conduct *as he
himself described it* amount to self-defense. Thus, even
in the absence of a jury instruction purportedly
suggesting defendant's testimony was insufficient if
uncorroborated, defendant could not have prevailed on
his self-defense claim.

11

12    *Rodriguez-Montero*, 2008 WL 2516484 at *14-15 (italics in original).

13          Petitioner claims that the instruction had the effect of "diminishing [his] testimony . . . ."

14    Pet., attached Petition for Review at 20.  As the court of appeal observed, this is incorrect.  The

15    instruction was, if anything, favorable to Petitioner, in that it told the jury that the testimony of one

16    witness – including Petitioner – was sufficient, if believed, to prove a fact.  The instruction did not

17    violate Petitioner's due process rights or his right to present a defense.  Nor was the Court of

18    Appeal's conclusion that Petitioner suffered no prejudice as a result of the instruction unreasonable.

19    The rejections of this claim by the state appellate courts were not contrary to, or unreasonable

20    applications of, clearly-established United States Supreme Court authority.

21          3.        Cumulative Error

22          Petitioner alleges that his above claims, even if they do not amount to constitutional error in

23    themselves, when added together show that the trial as a whole was a violation of due process, *i.e.*,

24    cumulative error.  But when there is no constitutional error, there is nothing to accumulate.

25    *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  This claim is without merit.

26    ///

27    ///

28    ///

United States District Court
For the Northern District of California

B.      Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that enters a final order adverse to a petitioner to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This was not a close case.  For the reasons set out above, jurists of reason would not find the result debatable or wrong.  A COA will be denied.  Petitioner is advised that he may not appeal the denial, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a), Rules Governing § 2254 Cases.

## V.      CONCLUSION

The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of appealability is **DENIED**.  The Clerk shall close the file.

IT IS SO ORDERED.

Dated:  June 18, 2012

_____
EDWARD M. CHEN
United States District Judge